# IN RE ESTATE OF BOLETTE A. LUND.
## OMAR S. LUND v. FIRST NATIONAL BANK AND TRUST COMPANY OF MINNEAPOLIS.[1]

June 16, 1944.

No. 33,783.

[1]Reported in 15 N. W. (2d) 426.

618

*E. V. Molle,* for appellant.

*Charles F. Noonan* and *Dorsey, Colman, Barker, Scott & Barber,* for respondent.

THOMAS GALLAGHER, JUSTICE.

This is an appeal by Omar S. Lund from a district court judgment allowing the final account of the First National Bank and

Trust Company of Minneapolis as executor of the will of Bolette A. Lund, deceased. Omar is a son of the decedent.

On appeal, it is contended that the court erred in allowing the account, in that the executor had not included therein substantial items of receipts and was guilty of negligence in the administration of the estate whereby substantial assets thereof were lost; and on the further ground that certain real estate was held by decedent in trust for the Minnesota Land & Lumber Company, Inc. and that certain sums paid by the executor for attorneys' fees and commissions were unauthorized and unreasonable and should be disallowed. Numerous additional objections are referred to in appellant's brief and will be discussed later herein.

Anton Lund, father of Omar S. Lund, during his lifetime owned the controlling interest in the Minnesota Land & Lumber Company, Inc. It was capitalized at $15,000, represented by 300 shares of stock, each of the par value of $50. At the time of his death, Anton Lund owned 249 shares thereof and Omar 51. During his lifetime, Anton Lund conducted all his business affairs in the name of the corporation. He had no individual checking account or personal books of account. All his disbursements for personal purposes or otherwise were made from corporate funds. All real estate which he owned was held in the name of the corporation, with the exception of a farm known as the "Lac qui Parle farm," acquired in 1902, a house in Dawson acquired in 1926, and two additional farms not here involved, title to which was in his name as an individual. All family expenses were paid from corporate funds. Mr. Lund had nine children, and items paid out on behalf of any of them were entered on the books of the corporation in their respective names.

Anton Lund died in 1926. His wife and nine children survived him. By his will he left the Lac qui Parle farm and the house in Dawson to his wife, Bolette A. Lund. He also left her the 249 shares of stock in the corporation. After the death of Anton, Omar S. Lund continued to conduct the business of the Minnesota Land & Lumber Company, as manager thereof, while his mother, the decedent here, became president thereof. Books were kept in

the same manner as before, and all personal transactions of decedent and other members of the family were carried on through the corporation.

In 1928, Mrs. Lund made a will leaving most of her property to Omar. Thereupon proceedings were started by the remaining children to have a guardian appointed for her. This petition was denied. On March 15, 1930, she executed the will which after her death was finally admitted to probate and is the one involved here.

On April 2, 1934, Mrs. Lund died. Another son, Alf B. Lund, immediately procured his appointment as special administrator of her estate. The next day Omar and the First National Bank and Trust Company of Minneapolis filed a petition for the probate of the March 15, 1930, will and the appointment of said bank as executor, as provided therein. The remaining children objected to the probate of the will on the ground of undue influence on the part of Omar. The will was disallowed by the probate court, but subsequently, on appeal, was admitted to probate on August 28, 1935, 17 months after the death of Mrs. Lund. On that date the bank was appointed executor. At that time, Alf B. Lund was discharged as special administrator, and subsequently the present executor, claiming default in his account as special administrator, obtained a settlement from his surety in the sum of $1,511.41, which settlement was submitted to and approved by the probate court. No appeal was taken from such order.

A clause in the will of Bolette A. Lund which has led to much of the controversy here provided as follows:

### ARTICLE IV.

"As soon as my will has been admitted to probate and my executor has been appointed and the inventory of my estate has been filed in the Probate Court, and in any event within sixty (60) days from the date of the appointment of my executor, the Minnesota Land & Lumber Company, a corporation, shall assign, transfer and cause to be conveyed to my estate, all of the assets of said Minnesota Land & Lumber Company except the following described property, namely:

"Lots One (1), Two (2), Three (3), Four (4), Five (5), Six (6), Seven (7), Eight (8), and Fifteen (15), all in Block Forty-three (43), of Dawson, Minnesota, * * * including the lumber yards and sheds thereon and the stock of lumber, supplies and materials contained therein, and also including all coal sheds, situated on the right-of-way of the Minneapolis & St. Louis Railway Company, at Dawson, Minnesota, as well as all stocks of coal on hand; provided, however, that if the inventoried value of lumber, materials, supplies and coal on hand at the time of the transfer is less than $25,000.00, then the company shall retain a sufficient amount of accounts receivable, bills receivable (such accounts and bills to be selected by Omar S. Lund), and cash to make up the deficiency between the inventoried value of lumber, supplies, materials and coal, and the sum of $25,000.00. It is my intention that after the transfers of property have been completed, the Minnesota Land & Lumber Company will own the above described real estate and in addition, lumber, materials, supplies, coal, accounts receivable, bills receivable, and cash of the inventoried value of $25,000.00.

"I give and bequeath all of my capital stock in the Minnesota Land & Lumber Company to my son Omar S. Lund, and direct that my executor assign said stock to him as soon as is possible after the above mentioned transfers of property have been completed. In the meantime, he shall be retained as general manager of the company at the same salary that he was receiving at the time of my death, and after the transfer of property by the company is completed, all earnings of the company shall accrue to his benefit even though the stock shall not be immediately transferred to him. * * *."

The remaining property was left to the other children of decedent, Omar not participating therein under the terms of the will.

Following its appointment as executor, the First National Bank and Trust Company of Minneapolis endeavored to have Omar select from the assets of the corporation the accounts receivable and other items of property to make up the $25,000 referred to in the will, the executor claiming the personal property of the corporation in excess thereof. Additional real estate owned by the corporation and

known as the "Lund Block," not referred to in the will, was claimed for the estate by the executor under Article IV of the will above referred to. Omar failed or refused to make any selection of corporate assets, and continued as corporation manager, as provided in the will. He contended that all corporate property was subject to the payment of said $25,000 under the terms of the will. To protect the estate's claim to the corporate assets, the executor, through its control of the 249 shares of stock above referred to, in 1936 placed its representative in charge of some of the assets of the corporation. These included certain notes and accounts receivable. The executor also endeavored to collect the rentals from the Lund Block for a period from 1937 to 1941.

To settle the differences of opinion between the executor and Omar, on June 10, 1940, Article IV of the will was submitted to the probate court for construction under the declaratory judgments act. That court construed the paragraph to mean that both the real and personal property of the corporation was subject to payment of the $25,000 referred to therein, but that if such real and personal property was insufficient to pay the same, the bequest to that extent would fail. In other words, assets of the estate as distinct from the corporate assets were not subject to the payment thereof. Thereupon the executor withdrew from the corporation and turned back to it the Lund Block and other assets the executor had been handling. No corporate assets of any kind, real or personal, were at any time transferred to the estate, nor did Omar at any time make a selection of the personal assets to make up the special bequest as provided in Article IV until subsequent to said declaratory judgment. In consequence, the executor had retained possession and control of the 249 shares of corporate stock throughout the proceeding, contending that there was no necessity to transfer the same to Omar until the corporate property specified in Article IV had been transferred to the estate from the corporation. Subsequent to the withdrawal of the executor from the affairs of the corporation after the declaratory judgment above referred to, suit was started against Omar S. Lund by Carleton College, and in connec-

tion therewith all property in the hands of the executor was garnisheed by plaintiff. The executor disclosed that it held the 249 shares of stock in the estate and delivered them to the district court pending the outcome of the litigation, where they have since remained.

The declaratory judgment required the executor to inventory the assets of the corporation, and on July 1, 1940, an inventory was made which showed that at that time the assets of the corporation were as follows:

| | |
|---|---|
| Office fixtures, etc. | $755.50 |
| Lumber, materials and supplies | 1,501.03 |
| Accounts Receivable | 2,684.83 |
| Notes, judgments and choses in action | 1,834.42 |

The executor had collected some of the notes and accounts receivable and, after payment of attorneys' fees and commissions in connection therewith, had paid creditors of the corporation *pro rata* on their claims. In its final account, such receipts and disbursements were set forth in detail.

The corporation had ceased doing business in 1935, prior to the time the executor was appointed. At that time substantial judgments had been entered against it, and large accounts of creditors remained unpaid, for which lawsuits and bankruptcy proceedings were threatening. Taxes on all real estate of the corporation were delinquent. Drought and dust storms had affected the entire district served by the corporation and rendered a substantial portion of the notes and accounts receivable worthless.

In 1937, two actions were started by the executor against Omar S. Lund, one on behalf of the corporation for an accounting of property collected by Omar, and the other by the executor individually seeking recovery from Omar of certain funds collected by him claimed to be the property of the executor. These actions were dismissed upon stipulation. In such actions Omar for the first time claimed that the corporation was the owner of the Lac qui Parle farm and the house in Dawson. No claim of such nature

had been made at the time of the death of Anton Lund, at which time said property had been devised to the decedent here, nor during the first three or four years subsequent to the death of Bolette A. Lund.

On July 8, 1941, the executor having ascertained by the declaratory judgment that it had no further interest in the corporate affairs of the property, filed its final account. This was separated into two parts, one relating to the estate and the other to the corporation. Objections filed thereto by Omar S. Lund again set forth the claim that the Lac qui Parle farm and the Dawson house belonged to the corporation and were held by the estate in trust for it. The probate court and the district court on appeal denied this claim and allowed the executor's final account after making certain charges against the same in favor of the corporation. In a lengthy memorandum attached to its order, the district court set forth in detail the history of the family and the property involved in the various transactions of both the executor and Omar. It determined that the latter's claim of negligence on the part of the executor was not sustained, and found that the executor had acted in good faith throughout in connection with its endeavor to collect the accounts and notes receivable belonging to the corporation and in its disbursement of funds in connection therewith. It further determined that the executor was not negligent in failing to collect accounts carried on the corporate books as charges against the remaining children of Anton and Bolette Lund, and that the expenses of the executor in making collections on behalf of the corporation were reasonable and proper, subject however to the rights of the corporation to adjust the account between it and the law firm of Saltness & Lentz, of Dawson, attorneys for the executor, in connection with the rental of part of the corporate property.

■ A careful examination of the entire record and the numerous exhibits on file herein is convincing that there are involved on this appeal only fact questions, and we cannot escape the conclusion that there is substantial evidence reasonably to sustain the district court's findings thereon. It appears from the record that the loss

of the corporate assets and the consequent failure of Omar to gain the specific bequest of $25,000 from the corporation was due primarily to two factors, neither of which was caused by the negligence of the executor: (1) business conditions occasioned by drought, dust storms, and other natural factors which caused the corporation to cease doing business in 1935 prior to the appointment of the executor and which rendered worthless most of its accounts and notes receivable; and (2) Omar's refusal to select assets of the corporation to make up said $25,000 and thereby permit the executor properly to divide the corporate assets and recover those belonging to the estate. By virtue of the terms of the will, the executor was justified in believing that certain of the corporate assets, both real and personal, would ultimately be transferred to the estate; and until such transfers were made there was no obligation on its part to deliver the 249 shares of corporate stock to Omar.

Accordingly, it is clear that the action of the executor in taking control of the corporation and endeavoring to realize cash on some of its assets was in keeping with its obligations and duties as executor of the estate. The court found that it did not act negligently in connection therewith, and that its expenditures for attorneys' fees and commissions on the amounts collected were reasonable. Since these are exclusively fact questions and there is ample evidence to sustain the court's findings thereon, we have no choice but to affirm them.

With reference to the claim that the executor negligently failed to preserve the real estate from tax forfeitures, we are again of the opinion that the record sustains the trial court's findings thereon. At the outset, the executor had no cash either in the estate or the corporate account with which to pay delinquent taxes. Had it used the money collected from the notes or accounts receivable for that purpose, bankruptcy proceedings no doubt would have been instituted immediately by dissatisfied creditors. Appellant contends that the executor, while in control of the corporation, might have refinanced the properties by obtaining mortgages thereon and using the proceeds thereof for the payment of such delin-

quent taxes, thereby preserving the real estate. However, the record is clear that, because of the unsatisfied judgments against the corporation and the general business conditions which then existed in that district, it was extremely unlikely that a mortgagee could have been found to advance the necessary additional funds on the security offered. The corporation had ceased doing business. Its accounts receivable and notes were for the most part uncollectible. All its real estate was subject to delinquent taxes. Its financial position was steadily growing worse instead of better. No showing was made by appellant, upon whom fell the burden, that a real estate loan might have been obtained, nor was evidence submitted of the willingness of prospective lenders to advance money in the face of such adverse conditions. Forfeiture of the property under the tax laws and the subsequent sale by the state of a portion of it for amounts less than the tax liens thereon are corroborative of this fact. As stated in 33 C. J. S., Executors and Administrators, § 247:

"Executors * * * are not insurers, nor will they be chargeable with the loss or depreciation of the assets where they have acted in good faith and with due prudence and diligence in the care and management of the estate, but they are liable for losses which are the consequence of bad faith or of the want of due prudence and diligence."

In this connection, loss from waste or depreciation of assets will not be presumed to be the fault of the executor, but must be clearly established by the party asserting the same. 33 C. J. S., Executors and Administrators, § 243, notes 21, 23, and 24. Under all circumstances here present, we hold the evidence sufficient to support the trial court's finding that there was no negligence on the part of the executor in this connection.

■ Likewise, the evidence is amply sufficient to sustain the finding that the Lac qui Parle farm and the Dawson house did not belong to the corporation and that the title thereto was not held by the estate in trust. At the time the same were purchased Anton Lund was in full control of the corporation and had the entire

right to the profits and dividends therefrom. This method of withdrawing surplus or profits was acquiesced in by the corporation. No evidence of any kind was submitted which would uphold or sustain a finding of a trust, constructive or otherwise, in favor of the corporation, and the court properly held that this property belonged to the estate. Minn. St. 1941, §§ 501.07 and 501.08 (Mason St. 1927, §§ 8086 and 8087). There is no evidence whatsoever of an express trust under § 501.11 (§ 8090).

■ With reference to the charges against the other children shown on the books of the corporation, it is apparent that all of them were entered on the books prior to the death of Anton Lund and the decedent here. This method was followed to provide for the family and the requirements of the children. No reference was made thereto in the will of either parent, and it is clear that there was no intention on their part that such personal expenditures for living and educational requirements should be collected by the corporation for the benefit of one child as against the others. They were in the nature of personal withdrawals by the owner of the corporation, who otherwise might lawfully have withdrawn the same amounts as salary or dividends. This procedure was acquiesced in at all times by the corporation, which at no time regarded either decedent or Anton Lund liable for the repayment of such withdrawals. If any liability therefor existed, it was that of the persons withdrawing said funds—Anton Lund or the decedent. No actions or claims for such amounts were filed by the corporation either against the estate of Anton Lund or of the decedent here during the long period of time in which appellant alone controlled the affairs of said corporation. On the other hand, if such sums be regarded as debts due decedent or the estate from said children, then appellant has no interest therein, as he is not a beneficiary of the assets of the estate other than the corporate properties hereinbefore referred to.

■ The evidence discloses that the liability of the special administrator to the estate was compromised and settled by the executor and surety. The amount arrived at was paid to the execu-

tor by the surety, and an order was properly made by the probate court approving the settlement and releasing the surety from further liability thereon. Appellant contends that the special administrator sold property on the Lac qui Parle farm which belonged to the corporation. The record discloses, however, that this property was purchased prior to the death of decedent, and apparently upon the reasonable assumption that it was to belong to her as part of the farm equipment. It is conceded that the special administrator had no access to or control over the corporate assets other than the equipment mentioned. Under such circumstances, it must follow that, regardless of the action taken by the executor and surety, no damage resulted to appellant from the settlement, since he had no further interest in the estate, nor any claim thereon outside of the corporate assets.

■ Apellant contends that the executor did not account fully for the rentals of the Lund Block during the period in which executor managed the same. The latter in its final account set forth all items collected by it from every source, either on behalf of the estate or of the corporation, and under oath affirmed that the account thus submitted showed all items collected. Appellant presented no evidence to the contrary. Again we must conclude that the evidence reasonably sustains the trial court's finding that all funds collected by the executor were accounted for.

Numerous other claims of negligence and error have been set forth. To discuss all of them would fill a volume. We are satisfied, however, that all of them present fact questions and that there is sufficient evidence to sustain the trial court's findings thereon. S. Bader & Sons v. Gensler, 191 Minn. 571, 255 N. W. 97.

Affirmed.